Filed 6/4/26; Certified for Publication 6/22/26 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B350634 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA113590) |
| v. | |
| EUGENE L. SACCO, | |
| Defendant and Appellant. | |

     APPEAL from a judgment of the Superior Court of Los Angeles County, Rita L. Badhan, Judge. Affirmed.

     Gressley & Donaldson, Lara Gressley, for Defendant and Appellant.

     Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Defendant Eugene L. Sacco was charged with a series of financial crimes involving opening bank accounts under false pretenses and taking money belonging to a local post of the American Legion. Sacco moved for mental health diversion under Penal Code section 1001.36,[1] supported by an assessment report from a psychologist.  The trial court denied Sacco's motion.  The court found that although Sacco had been diagnosed with a "mental disorder" (§ 1001.36, subd. (b)(1)), the evidence rebutted the presumption that the mental disorder was a factor in the offenses (*id*., subd. (b)(2)).  Sacco pled no contest to one count of grand theft.

On appeal, Sacco contends the trial court erred in denying his motion for mental health diversion, arguing that the court applied the wrong legal standard and the court's finding was not supported by substantial evidence. We find no error, and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Alleged crimes

The People charged Sacco with five counts: 1. identity theft of the personal information of Carmen S.[2] on August 24, 2016 (§ 530.5, subd. (a)); 2. forgery on August 24, 2016 (§ 470, subd. (b); 3. 1. identity theft of the personal information of Carmen S.  on February 17, 2017 (§ 530.5, subd. (a)); 4. identity theft of the personal information of American Legion Post 13 on December 3, 2018 (§ 530.5, subd. (a)); and 5. grand theft of $11,534.08 from

---

[1]     All undesignated section references are to the Penal Code.
[2]     We refer to the individual victim by first name to protect her privacy.  (See Cal. Rules of Court, rule 8.90(b)(4).)

American Legion Post 13 between December 6, 2018 and July 12, 2019 (§ 487, subd. (a)).

At the preliminary hearing, Aaron Ward, a financial crimes investigator for the California Attorney General's Office, testified that he investigated a report from American Legion Post 13. His investigation revealed the following.

Post 13 was receiving mail that had already been opened, and believed it was not receiving "all of the revenue that it was due." Members of Post 13 suspected Sacco was behind these issues. Post 13 occupied the top floor of a building on North Marengo Avenue in Pasadena. The bottom floor of the building consisted of five offices that were rented out as a source of revenue for Post 13. Sacco rented one of the offices. Sacco was not a member of Post 13; all members must be veterans, and Sacco was not.

Post 13's chief financial officer (CFO) reported a missing check from a deceased member of Post 13, Michael Drysdale. In 2019, the CFO learned that Drysdale had died and, through his trust, had left a gift for Post 13 in the form of a check for $11,534.08 dated November 27, 2018. Post 13 never received the check. The CFO learned that Sacco had contacted the trust by phone and email in December 2018. Sacco returned the original check to the trust, and requested that a replacement check be issued payable to "Legion Corporation of Pasadena." The replacement check, dated December 6, 2018, was then deposited to a Wells Fargo Bank account of the similarly named "Legion Club of Pasadena."

In August 2021 a search warrant was served on Wells Fargo for records relating to Sacco; Ward received documents relating to 13 different accounts. One Wells Fargo account listed

as the owners Sacco and the "Legion Club of Pasadena," which was a dba of Sacco. The Legion Club of Pasadena was neither a corporation nor a nonprofit, and it was not affiliated with Post 13. The $11,534.08 check from Drysdale's trust was deposited into this account. In September 2017, Sacco signed a document representing to Drysdale's trust that the beneficiary of the distribution was American Legion Post 13. The money was never given to Post 13.

The owner of another account was the "Sons of the American Legion Squadron 13," which was a dba of Sacco. Account documents listed Sacco as president and bore his signature. This account did not belong to Post 13, but the federal tax identification number (EIN) provided for the account was Post 13's EIN.

Ward also testified about a false document dated August 24, 2016, purporting to be a certification from a corporate secretary of American Legion Post 13. The document listed Sacco as a "director" of Post 13. The document bore the American Legion Post 13 seal and was purportedly signed by Carmen S. Ward testified that the purpose of the document was to "introduce the four directors named in the letter to Wells Fargo Bank," and represent Sacco as a director. Sacco was never a director of Post 13. When interviewed in 2022, Carmen S. reported that she had been employed by Sacco's business, Data True; she was never affiliated with Post 13. Carmen S. did not sign this document, she had never been corporate secretary of Post 13, and she did not have access to Post 13 letterhead. Carmen S. also reported that the phone number listed as hers on the document was not her phone number, and the email address, which included "oldtownpost13," was not her email.

The CFO of Post 13 also reported that Post 13 apparently had certain bank accounts at Morgan Stanley, but he could not get any information about them. Records produced as a result of a search warrant revealed a Morgan Stanley account for another Sacco dba, the Legion Corporation of Pasadena. The account application documents, dated February 9, 2017, were signed by Sacco and purportedly bore the signature of Carmen S. as secretary. No other authorized users were on this account. Carmen S. did not sign these documents and she was never corporate secretary of the Legion Corporation of Pasadena. This account was "linked" to Post 13's actual account at Morgan Stanley. On March 9, 2017, nine transfers totaling $100,262.19 were made from Post 13's account to this account. The transfers were not authorized by Post 13.

Ward interviewed Sacco in July 2023. Sacco said he did not recognize the August 2016 letter to Wells Fargo purporting to list him as director of Post 13. Sacco said the letterhead on the document belonged to the Sons of the American Legion. Sacco said Carmen S. was not affiliated with Post 13 and he did not know why her signature was on the document. Regarding the accounts at Morgan Stanley, Sacco told Ward that there was "some urgency" in setting up the accounts, and the board of Legion Corporation authorized him to do so. Sacco denied ever making transfers from a Post 13 account to his own account.

Sacco admitted to Ward that he received the check from Drysdale's trust, requested a replacement check, and deposited it. Sacco told Ward that he was authorized to receive these funds for Legion Corporation of Pasadena "for maintenance on the building."

5

**B.      Motion for mental health diversion**

Sacco moved for pretrial mental health diversion under section 1001.36.  Sacco stated that he had been diagnosed with a mental health disorder, "Persistent Depressive Disorder with Anxious Distress, Severe-Moderate."  He noted that he had no prior criminal convictions, and argued that he would not present a public safety risk.

Sacco submitted the 17-page report of a psychologist, Dr. Nicole Paglione.  Paglione stated that she interviewed Sacco for approximately two hours over Zoom on July 28, 2024 to assess his eligibility for pretrial mental health diversion.  Paglione discussed Sacco's reported issues with his childhood and family, which Sacco described as "dysfunctional" and in "constant turmoil."

Sacco reported to Paglione that he had been heavily involved with the Sons of the American Legion since childhood, and had joined Post 13 around 2012.[3]  Sacco's employment history included working with a savings and loan company and a collections agency, then opening his own business specializing in financial fraud prevention.  Sacco suffered financial strain and emotional stress related to caring for his adult brother, an experience he characterized as a "nightmare" that had cost him over a million dollars, which "could have gone to my retirement, which I don't have."  Sacco "also described experiencing great emotional difficulty during the COVID-19 pandemic," largely arising from his daughter's mental health issues.  Sacco did not seek mental health treatment before his current legal troubles.

---

[3]      The American Legion and the Sons of the American Legion are separate but related organizations.

When asked about depression symptoms, Sacco reported that he experienced sleep disturbances and times when "he does not want to get up or 'function at all.'" When asked about anxiety symptoms, Sacco reported "shortness of breath, sweating, sometimes abdominal pain, and his heartbeat 'goes through the roof.'" Sacco also reported that his emotional disturbances caused forgetfulness and distractibility, such as "having a bank deposit on his desk and thinking he needs to deposit it; however, something then draws his attention away, and he simply forgets to deposit it." Sacco stated that he enjoys walking his dog and cooking, and that he would like to get "back into golf," but because golf is a "mental sport" and he has trouble concentrating lately, "he would not be able to play a round of golf." Paglione noted that Sacco's therapist sent her a letter stating that Sacco "'clearly met the diagnostic criteria for Adjustment Disorder with Anxiety.' The letter further described Mr. Sacco's anxiety as intensifying over the past year, such that he has difficulty functioning and focusing at work."

Paglione opined that "the most appropriate diagnosis at this time appears to be . . . Persistent Depressive Disorder, with Anxious Distress, Moderate-Severe." She observed that Sacco's "symptom profile appears to consist of extended periods of depressed mood, dating back to his childhood," and his "periods of depression have been marked by irritability and agitation; appetite disturbances, most often manifesting as overeating; sleep disturbances, leading to an inability to sleep more than five-to-six hours per night; low self-esteem and self-worth; poor concentration and focus; memory impairments; and feelings of helplessness." These symptoms "have caused significant distress and impairment in different aspects of Mr. Sacco's daily

functioning." Paglione noted that Sacco's "depression has likely ebbed and flowed throughout his life."

Paglione opined, "The defendant's mental disorder **was** a significant factor in the commission of the charged offense. [¶] The present allegations date back to 2016 and appear to have exacerbated Mr. Sacco's persistent depression and anxiety, such that he only recently obtained a clinician and psychiatric medication." Paglione felt that Sacco would respond positively to further treatment, and that he would not pose an unreasonable risk of danger to public safety. Paglione therefore concluded that Sacco was a good candidate for mental health diversion under section 1001.36.

The People opposed Sacco's motion, asserting that Sacco's mental health disorder was not a significant factor in his crimes. The People asserted that Sacco was the manager of the building in which American Legion Post 13 operates, but in contrast to the representations in Paglione's report, "[a]t no time was Mr. Sacco a member of Post 13 or affiliated with Post 13." Sacco received mail containing the $11,534.08 donation check for Post 13, but rather than delivering it to Post 13, Sacco requested a replacement check and deposited the check into his own an account. The People further alleged, "On several occasions, Mr. Sacco held himself out as a director of Post 13 to gain access to Post 13 bank accounts."

The People argued that none of the evidence submitted by Sacco supported a finding that his claimed mental disorders were a significant factor in his commission of the charged crimes. The People asserted that Sacco's motion did "not list [Sacco's] symptoms or attempt to explain how they contributed to his commission of the charged fraud." In addition, the People argued

8

that the facts surrounding Sacco's criminal acts, including the "numerous actions" Sacco took to further the scheme, "rebut any claim that his actions were all the product of a mental disorder." No evidence was filed with the People's opposition. Sacco then filed a response in support of his motion.

## C.     Ruling on Sacco's motion

At the hearing on Sacco's mental health diversion motion, the court stated, "[T]he court does have concerns about whether there's a nexus between Mr. Sacco's mental health condition and the charged offense," and invited oral argument.

Defense counsel discussed Paglione's report, including her statement that Sacco had experienced depressed moods since childhood, family discord, and chaos.  Defense counsel asserted that Paglione said Sacco suffered an "'inability to effectively cope with challenging situations and exercise sound judgment and decision making.'  I suggest to the court that that is what this case is about, decision making and judgment."  After defense counsel finished his initial argument, the court asked him what information Paglione had reviewed, asking, "I don't see that she reviewed any discovery or factual information in the case; is that correct?" Defense counsel said Paglione had reviewed the complaint for arrest warrant, which "very briefly laid out what was alleged in this case," but not any evidence.

The People submitted without argument.  The court then heard a witness statement from Post 13's counsel, who argued that Sacco's motion should be denied. Post 13's counsel asserted that Sacco "took a position of trust, and he used it to loot Pasadena Post 13."  He argued that Sacco employed a "very sophisticated" scheme to convince Drysdale's trust that Sacco represented Post 13, including using Post 13's address and EIN,

9

requesting a new check, and depositing that check into his own account.  He noted that a civil case had also been filed in an attempt to get Post 13's money back.  Post 13's counsel argued that "this is not something that is based on depression. . . . This is a sophisticated scheme which is continuing to this day. To this day these members are still victims" because the stolen money had not been repaid.  Defense counsel stated in rebuttal that Post 13's argument was full of "inaccuracies," and "to talk about this being something sophisticated is absolutely ridiculous."

The court stated that it had "read and considered the defense motion for mental health diversion, the People's opposition, the defense reply, the case file, and all the argument and comments made today."  The court denied Sacco's motion based "on the issue of nexus between the mental health condition and the charged offense."  The court found that the "other factors that need to be shown for mental health diversion have been met . . . . So there's clearly a diagnosis contained in Dr. Paglione's report and certainly Mr. Sacco is not a danger to the community . . . ."  Paglione's report was "extremely comprehensive about Mr. Sacco's background which is one reason why I find her analysis of . . . whether the mental disorder was a significant factor in the commission of the charged offense[ ] to be lacking and to be contradicted and rebutted by what the court knows about the facts in the case."  The court observed that Paglione's report included "no evidence that she reviewed anything factual in the case," suggesting that "she doesn't really have any background about the charged offense or facts in the case."

The court observed that "the statute . . . creates a presumption, but it's a rebuttable presumption that there's a nexus between a person's mental health and the charged offense."

The court also noted that "the court can consider any relevant and credible evidence in making that determination. The court is not bound by the expert's opinion." The court continued, "[T]here's no explanation in the report how [Sacco's] depression with distressed anxiety would contribute to him committing the alleged offenses, the forgery, grand theft, and identity theft, not just on one occasion, but over a period of time. [¶] So on that basis the court finds that factor lacking, and, for that reason, the court denies the motion for mental health diversion."

Sacco filed a petition for writ of mandate challenging the court's order. This court denied Sacco's petition on April 23, 2025.

On September 29, 2025, Sacco accepted a plea deal on count 5, grand theft. (§ 487, subd. (a).) The court dismissed the remaining counts. Sacco sought and received a certificate of probable cause. He timely appealed.

## DISCUSSION

Sacco argues that reversal is required because the court applied the incorrect legal standard and the court's findings were not supported by substantial evidence. The People contend the court appropriately applied the statutory presumption, and correctly found that the presumption was rebutted by the evidence.

"A trial court's ruling on a request for mental health diversion is reviewed for abuse of discretion, and the court's factual findings are reviewed for substantial evidence. [Citation.] '[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it.' [Citation.] However, it is also true that '[a] court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its

11

decision on express or implied factual findings that are not supported by substantial evidence.'" (*Lacour v. Superior Court* (2025) 110 Cal.App.5th 391, 401 (*Lacour*).)

## A.      Legal background

"In 2018, the Legislature enacted section 1001.36 to create a program of pretrial diversion for criminal defendants with diagnosed mental health disorders." (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 890.) "Effective January 1, 2023, mental health diversion requires trial court findings that the defendant is both *eligible* for diversion and *suitable* for the program. The criteria for each are specified in the statute." (*Ibid.*)

Here, the issue is eligibility under section 1001.36, subdivision (b), which states, "A defendant is eligible for pretrial diversion pursuant to this section if both of the following criteria are met: (1) The defendant has been diagnosed with a mental disorder . . . . (2) The defendant's mental disorder was a significant factor in the commission of the charged offense. If the defendant has been diagnosed with a mental disorder, the court shall find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense. A court may consider any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense."

## B.    The court did not apply the wrong legal standard

Sacco first contends the trial court applied the wrong legal standard.  He observes that because he had been diagnosed with a mental disorder—Persistent Depressive Disorder, with Anxious Distress, Moderate-Severe—the trial court was required to apply a presumption in favor of eligibility.  (See *Sarmiento, supra*, 98 Cal.App.5th at p. 891 [§ 1001.36, subd. (b) "creates a presumption that the defendant's diagnosed mental disorder was a significant factor in the commission of the charged crime"].)  Sacco argues that under the statute, the "burden then shifts to the prosecution to introduce" clear and convincing evidence establishing that the mental disorder did *not* contribute to the commission of the offense.  Sacco argues that the People's opposition "presented *no evidence*," and the opposition itself cannot not constitute evidence, so the statutory presumption "was not rebutted with evidence, let alone clear and convincing evidence."

To the extent Sacco is arguing that the court was constrained to deciding whether the People's opposition met a certain "burden"—rather than considering all the evidence before it—we disagree.  Section 1001.36, subdivision (b)(2) states that a trial court "may consider *any* relevant and credible evidence," including "preliminary hearing transcripts" "witness statements," and any other "evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense."  (§ 1001.36, subd. (b)(2), emphasis added.)  Thus, a trial court may consider *all* relevant evidence in deciding the motion.  (See, e.g., *People v. Graham* (2024) 102 Cal.App.5th 787, 796 ["section 1001.36, subdivision (b)(2) authorizes the trial court to consider any relevant and credible evidence regardless of the format or timing of its presentation"].)

Sacco relies on *People v. Harlow* (2025) 113 Cal.App.5th 485 (*Harlow*), which stated: "[A] qualifying diagnosis creates a presumption that the defendant's mental condition contributed to his criminal behavior. And the prosecution can only rebut this presumption by producing clear and convincing evidence that there was no causal connection." (*Harlow, supra*, 113 Cal.App.5th at p. 490.) Harlow further stated, "Once the defendant produces a timely mental health diagnosis, the statute requires that the court presume the crime with which the defendant is charged was causally related to his mental condition. The burden then shifts to the prosecution to show by clear and convincing evidence that the defendant's diagnosed mental disorder was not a contributing factor." (*Id*. at p. 491.) Sacco points to this language in *Harlow* and asserts the prosecution is required to rebut the statutory presumption by producing evidence *with its opposition*. We disagree that *Harlow* suggests any evidentiary limitation or requirement not expressly enumerated in section 1001.36.

Sacco further contends the trial court failed to apply the statutory presumption at all. The record does not support this argument. The trial court stated that "the statute . . . creates a presumption, but it's a rebuttable presumption that there's a nexus between a person's mental health and the charged offense." The court acknowledged that Sacco had been diagnosed with a mental disorder, stating, "there's clearly a diagnosis contained in Dr. Paglione's report," so certain "factors that need to be shown for mental health diversion have been met." Nothing in the record suggests that the court failed to apply the appropriate statutory presumption. (See *People v. Ramirez* (2021) 10 Cal.5th

14

983, 1042 ["Absent evidence to the contrary, we presume that the trial court knew the law and followed it"].)

## C. The court's ruling was supported by substantial evidence

The court denied Sacco's motion because it found that "whether the mental disorder was a significant factor in the commission of the charged offense" was "contradicted and rebutted by what the court knows about the facts in the case." Sacco argues that in finding that the presumption was rebutted, the trial court erroneously relied on a "lack of evidence," including Paglione's failure to explain a connection between Sacco's diagnosis and the facts of the case, rather than clear and convincing evidence that his mental disorder was not a factor. We find no error.

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012; accord, *Lacour, supra*, 110 Cal.App.5th at p. 401.)

Here, the record as a whole contains substantial evidence supporting the court's finding.  According to Paglione's report, Sacco reported that his depression and anxiety were characterized by sleep disturbances, periods in which "he does

15

not want to get up or 'function at all,'" and physical symptoms such as a racing heartbeat and shortness of breath. Paglione stated that Sacco's periods of depression were "marked by" symptoms such as "poor concentration and focus; [and] memory impairments," and that these symptoms "have caused significant distress and impairment in different aspects of Mr. Sacco's daily functioning." Sacco's therapist reported to Paglione that Sacco "has difficulty functioning and focusing at work." Sacco also told Paglione that he has trouble focusing, so much that he could not even play a round of golf "given his difficulty concentrating."

In sharp contrast to this low functioning and poor concentration, the evidence presented at the preliminary hearing showed that the charged crimes involved years of coordinated planning and execution. For example, Sacco opened multiple bank accounts under false pretenses, including using names that mimicked real entities, using Post 13's EIN, and presenting a false document representing to the bank that Sacco was a "director" of Post 13. In the one crime for which Sacco pled no contest—grand theft of Drysdale's donation to Post 13—Sacco took several coordinated steps to accomplish the task, including intercepting the first check, contacting the trust by phone and email, requesting reissuance of the check, signing trust documentation representing that Post 13 was the recipient of the donation, and depositing the check into Sacco's own account.

The court's questions about the basis for Paglione's opinion were reasonable, particularly given that Sacco's criminal behavior did not reflect the mental health symptoms she described. "[T]he value of an expert's testimony depends on the material upon which the opinion is based and the reasoning used to form that opinion," and a "trial court may reject completely the

16

testimony of an expert witness, as long as its decision to do so is not arbitrary." (*People v. McCoy* (1995) 40 Cal.App.4th 778, 785.) The court was not obligated to adopt Paglione's conclusions as its own. Based on the totality of the evidence in the record, the court could reasonably reject Paglione's conclusion, and find that Sacco's depression or anxiety—which was characterized by forgetfulness, poor concentration, and impaired mental functioning—"was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense." (§ 1001.36, subd. (b)(2).)

This case is not similar to *Lacour, supra,* 110 Cal.App.5th 391, as Sacco contends. In that case, which involved burglaries by multiple perpetrators, there was evidence "suggesting that the crimes were planned, [but] the court also found there was no evidence regarding who planned the burglaries. Therefore, it cannot be determined with any degree of certainty that petitioner planned the burglaries, or that his involvement in the scheme was anything other than an impulsive decision brought about by his mental disorder." (*Id.* at p. 403.) The Court of Appeal held that "no substantial evidence supported the court's finding that the statutory presumption had been overcome by clear and convincing evidence." (*Id.* at p. 404.) Here, by contrast, the evidence showed that Sacco acted alone, over a period of several years, to effect the alleged crimes.

Noting the court's observation that Paglione did not discuss any evidence in her report, Sacco argues, "[E]ven if Dr. Paglione did not have all the facts, that does not provide a lawful basis to refuse to apply the statutory presumption." However, the court explicitly did not rely only on a lack of evidence in Paglione's report. Rather, the court stated that the statutory presumption

17

and Paglione's conclusion were "contradicted and rebutted *by what the court knows* about the facts in the case." (Emphasis added.)  Thus, the court relied on the evidence in the record, not a lack of evidence cited in Paglione's report.

**DISPOSITION**

The judgment is affirmed.


COGLIATI, J.*


ZUKIN, P. J.


TAMZARIAN, J.

---

* Judge of the Santa Cruz Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**
IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA SECOND

APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent, v.<br><br>EUGENE L. SACCO,<br><br>    Defendant and Appellant. | B350634<br><br>(Los Angeles County Super. Ct. No. GA113590)<br><br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT

The opinion in the above-entitled matter filed on June 4, 2026 was not certified for publication in the Official Reports.
Upon application of interested parties and for good cause appearing, it is ordered that the opinion shall be published in the Official Reports.

Pursuant to California Rules of Court, rule 8.1105(b), this opinion is certified for publication.

ZUKIN, P.J.          TAMZARIAN, J.          COGLIATI*

---

*        Judge of the Santa Cruz Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.